Next case for argument is 24-2350, Kove v. Amazon. Good morning, Your Honors. May it please the court, unless the court takes me elsewhere of the several issues in this case, I'd like to begin with section 101 and then turn to the claim construction issues. And when I get there, I think the simplest place to begin will be the non-hierarchical limitation. And I hope to talk about damages before I sit down as well. Well, there's a lot to get through. So can I just slide for my purposes, not speaking for the panel, but if hypothetically we would agree with you on step one, there remains the question of what happens with respect to step two, which divides whether or not we reach other issues in this case. And briefs in that regard say very little and seem to run past each other. But the other side does respond, as I understand it in red, that no, if you want to find for his side on step two, you can go there, but that there, and I'm not quite sure. I don't think he says because there are disputed issues of fact, although you've made that point in the summary judgment. But this came up in such a weird posture, motion to dismiss summary judgment, and you never filed your own cross motion for summary judgment here. They never reached the step two issue. So it seems like this is not the kind of thing we would decide in the first instance up here. So if you think I'm wrong about that, tell me why. Yeah, let me just react to that because you're correct that we did not move. We, I think, could not have moved because of the way the court had decided step one at the rule 12 stage. But when this court has decided. I didn't understand that. Why could you not have moved that the district court that you were entitled to win under step two? So because the district court concluded that it was law of the case that we could not prevail on step one. And so I don't mean that we couldn't have filed a motion. I mean, that the court would have found that futile because in light of the law of the case. And I do want you to get back. But at page 26 of the appendix, the district court says that COBE and AWS have both moved for summary judgment. AWS also argues that it's entitled to summary judgment because the patents are invalid under section 101. What's that a reference to? So it may just be a mystery because you agree you did not file a motion for summary judgment on 101. That's right. I'll need to go and see what that page is referring to. But the point that I was trying to make is that when this court has taken up a case in which only step one was decided, sometimes the court remands. Sometimes the court has decided that there is nothing left to decide. Just before you get to that final point, I thought you made an argument or at least someone made an argument that the reason it wasn't law of the case was because between motion to dismiss and summary judgment motion, there are a whole slew of new claims added. So I guess that's why that would be my follow-up to your saying, well, it was already law of the case so we couldn't cross motion for summary judgment. Well, and of course the court rejected all of that. I mean, in other words, the court concluded that nothing that had happened since the Rule 12 stage mattered. Nothing about fact development, nothing about claim selection, nothing about the evolution of the law. We're justified departing from the law of the case. And the point that I wanted to make was that we did at that point put in an expert explaining why we would prevail at step two. The other side knew that we had an expert. We had a- Yeah, I know you put an expert opinion in the motion to dismiss. No, this was at summary judgment. Okay. And so the paragraph one of the other side's statement of facts that they submitted with their motion for summary judgment said basically, we know they're going to rely on an expert. It should not matter. And they did not put in their own expert. They didn't suggest that there was a fact dispute. And really, if you look at what they've said about step two through the entire history of this case, all they've said is the one page at the end of their Rule 12 opposition. And I think if you look at, it has some recitations, but then at the end, it just says that each of the three sets of claims contains a thing that is an inventive concept. So for the scaling claims, it is transferring. That's what they say. I think if you look at that page, you will see that they have never identified anything on which there could be a fact dispute. I certainly understand that when the court has, when this court has seen lurking fact disputes that were never resolved by the district court, it has generally sent step two back for resolution. And it would have discretion to do that here. It's just that the other side has never identified anything requiring resolution by a fact finder at step two. And I guess the... They do also make the point in red that your expert was conclusory. So I guess that's even more to it. Yeah, and we of course disagree with that. We have an expert, they don't have an expert. But the point that I was just making is that 661 to 62 of the appendix, you can see kind of the sum total of all the step two arguments they've made over the history of the case. I think it's fair to say that this case was litigated as a step one case because that's where the rubber met the road. And if I could, I would like to talk about the substance of the step one decision by the district court and why these claims don't pass step one. And I think it's helpful. There are three sets of claims and I'd like to take them sort of one by one. I think sort of the scaling claims are in a sense the simplest and then the other two each add some further step beyond that. But the scaling claims, they just relate to storage and transfer. They don't even relate to retrieval of the location information. They are generics, a generic server that stores data, a plurality, which can be two generic servers that store the location of those data. And when the first server gets either too full or too busy or something else, take some of the data from the first server and put it on the second server. That is the sum total of the scaling claims. And the scaling claims- And here by data, what you mean is index entries, not the underlying data for which that are being indexed. Correct, because the data repository, the data, that's just one server, one generic server.  And no one claims that that's an inventive server or an inventive hierarchy or anything. I'm sorry, an inventive arrangement or anything like it. And so I think this court has recognized both that location, the storing of index information is a pre-technical, pre-computer abstract idea. The court has recognized that transferring things from one computer, one computer program, or one server to another are likewise. That's an abstract idea. And in this case, this really is the recurring problem of attending to patent the result without specifying any particular means of doing so. So in other words, the performance criterion is not specified. And how the transfer is to occur is not specified. It just says in the dependent claim, automate the transfer. Well, automating a process is another classic example of something that under Section 101 doesn't add anything patent eligible to an idea that existed beforehand. And I think in our, on the scaling claims, our point was that this is no different than the card catalog at the library filling up and having to be- Let me translate the scaling claims to a patent number for me just to make sure I'm looking at the right thing. Sure, I'm sorry. So this is the 978 patent, claims 17 and 30. So in the front cover of our blue brief, it's the last two claims you'll find there. Okay. All right. And then, so that- Is the hash function part of that? No, the hash function lies only in claims one and two of the first patent in the cover, which is the 170 patent. And so, and I'd be happy to talk about the hash function, which ultimately is just an abstract algorithm. It is a way of transforming a piece of data into another piece of data. It's taking an input and it generates a standardized or an output of standardized length. And it uses that for indexing. But that other than being done on a computer using a hash function, I think the court has recognized in its previous cases, confronting hash functions, that especially where it's here, the hash function is described as a well-known function or a standard function in the specification. And the claims don't say anything about how to implement it beyond using a hash function, that that doesn't add anything to amalgamate. When you amalgamate a series of abstract ideas, you don't make it patentable. Can I just take a stab at a description and then you can tell me why my description is completely wrong or to me it will be, or why it's not an improvement to computer technology that would be patentable. So in the prior art, you would have a centralized server that contains location data. Now you can have many different servers. And because of this algorithm or system, you don't need to query all of those servers that store location information. You know, you can only go to the one that is gonna actually have the location information and that makes the system operate more efficiently. Am I getting the system wrong? Or that's not innovative? Yeah, I think respectfully that what you're getting back is you are getting back information from which you can determine the location, but you're not necessarily getting back the specific location. And the fact of our product F3, you know, bear that out because you get back, I understand that this is contested, right? But what you get back is this ID, the inode, which then has to go over into another product, another aspect of the system to have the actual location. So you're saying that you can get your read on the patent for that reason? No, no, no, that's right. But at their point, my point here in the 101 discussion is that they prevailed on infringement. I must think wrongly, but like emphasizing the breadth of the claims and the breadth of what it takes to be non-hierarchical as well. Like they got quite broad readings of each of these things so that you're not actually just getting back, you know, a zeroed in location. So that's one point. And the second point, and I do wanna try to address non-hierarchical quickly if I can. We'll give you enough time if there are questions. I appreciate that very much. So the second point is just that I don't think that you can attribute the selection of the hash function as opposed to a different algorithm to achieving an improvement in computer technology, which is generally what this course 101 cases have said it takes in order for a computer implemented invention to be a technological solution. In other words, it won't do to say that this is better because customers like it better or this is better because it's more efficient. It has to actually be an improvement in the workings of computer technology. And that I think is what separates this case from cases like EnFish, which were tackling a problem that the use of computer technology created. I think this court recognized in cases like PersonalWeb that the problems of scaling certain amounts of data and automating processes in the computer world don't respond to a technological problem. You adverted a moment ago to the possible relationship between the two claim construction issues that are before us and the 101. If we were to agree with you, if we were to get to the two claim construction issues and agree with you on those so that the claims suddenly became narrower, how would the 101 analysis be effective? I don't think it would materially narrow the claims in a way that would change their patent eligibility because ultimately being able, so for example, being able to return the actual location, if one server returns the actual location, if it doesn't have the relevant location on it, that's obviously, so your argument, for example, would work in the library context if it gave, whether it gives a shelf number or a room. Exactly. In which many, many shelves exist and you might not be able to find it without more information, but you'd still have the room. Right, I mean, the example we gave in the district court, and I think it touched on in our brief here in the redirect claims, for example, is that if you have multiple card catalogs and the card catalog just simply says on it, if you look, fiction here, if you're looking for history, that's in the catalog down the hall or something like that. When you have a set of indices, one index can direct you to another index and that, as the redirect claims come to the court, that is how, I think that illustrates the 101 problem that it is something that could be done without the technology. So would it just be the non-hierarchical issue? That's a little bit different. I mean, the reason that I adverted to the redirect claims is that I think it illustrates the card catalog analogy. Well, in the non-hierarchical point, the nub of the difference between us and the district court is that the district court's construction allowed a server to return any information from which the, sorry, information usable by the client to locate the server, whereas our construction was to know which location server contains the location information. So that, obviously, it would return a more precise answer, but if we're talking about 101, it's still returning location information, and it's still implementing the abstract idea of storing the index separate from the information, being able to return a more efficient answer. It doesn't make it subject matter eligible. It's still just separating the what from the where and returning the where answer when queried. Or if you're- My colleagues don't have anything on 101? So we're already, we've moved nice, swiftly to non-hierarchical. Just as a starting point, I don't, I'm not sure, I'm not clear on what construction you were proposing. Red has a very nice little chart on page 20, I think, that says, no difference. This is what the district court came up with. This is what you proposed. And then you have, on 26 of your brief, you have a response to that, and you, well, you say affirmatively, this is what we proposed. Where do we, what's the answer to that question? How do we determine it? So if you, and on the page before their chart, I believe you'll find that they very quickly acknowledge what we proposed in the pre-file order, and that is the relevant instruction. They don't, there's no chart on that. So if you look at page 29191 of the appendix, that is the, that would be in volume two. So you'll- Page two, 29. Volume two, oh, sorry, 29191. I hope I got that right. Yes, I did. Right, and it's the box at the top where it says AWS is positioned. And this is your pre-file order? That's right. This is a, and it's one of the many attachments to the pre-trial order that lists the disputed claim construction issues that had not yet been resolved. And then, so we proposed this instruction, the verbatim, the instruction that we're here appealing. And then further, keep going. Oh, I thought you needed a minute. Further, we reiterated the point in our response to a motion in limine, which begins at 30322. And that goes on for several pages. But we conclude at the end of that to say, again, this court should define non-hierarchical for the jury as AWS proposed in the instructions. And we again say the same thing. And did you explain anywhere, because I thought the whole heft of your argument was based on the fact that they gave this away in the prosecution history. And the prosecution history language had to do with Oracle and Tree and all this. So did you explain how this relates to the language in the prosecution? At length, in the motion in limine response that I just adverted to. So basically from 30322 to 27, there's a lengthy discussion of why this is, this is what the court found and what the inventors had disclaimed. Because remember, the court had found disclaimer. Like the other side said, we didn't disclaim anything. And the court disagreed with that. And it found disclaimer. The only question was what form of words to use to describe the disclaimer. And the court initially said, I'm not going to say anything beyond the words non-hierarchical. But then it was willing to add some of the words that Cove used during prosecution. And in its projection of our argument, it said, well, I used words that were right out of the history. Yes, that's true, but it didn't use the broadest words. It didn't accurately reflect what they surrendered in order to survive re-examination. And that is the problem. And this is, I mean, we've got a lot of cases that talk about you capture and surrender, even if it's broader than what was necessary to do to save the claim. Exactly. Does the stuff we're debating now fall into that pocket, that this wasn't necessarily necessary to preserve a claim, but it was nonetheless disclaimed? So let me answer in two steps. So I don't know whether you would say that the Oracle Art specifically would read on this form of words, but I do think that this form of words is the substance of what they proposed to overcome the Oracle prior art. So I want to be clear in my answer. Help me understand what concretely is the difference. This is the way that I've been trying to understand it, that the construction that was given just says if the server that gets the request doesn't have the location information, the server has to be able to return the location information without saying anything about how it gets it. Your construction about, or know it suggests that the server has to already know where the location is and not go fetch it from some other server in the tree and then get it back before setting it up. No, that's not quite right. For two reasons. So one, the construction the district court gave was information usable by the client to locate the server. So that's not even giving the actual location. It can just be information that says, take this to Skynet and it will tell you or something like that. What your honor is asking is about what the significance of the word contain. And that was hashed out at summary judgment and the district court said, no, the server doesn't have to contain the location. It might be able to generate it in some technological way. And that's not the fight that we're having here. We're having the fight between whether it must return the location information or instead just information usable by the client to find the location. Somebody else will know, go check the thing. Yes, that's basically right. And we have a collection of sites at page 52 of the blue brief that goes through just how often the other side's expert clung to the court's claim construction and said, essentially, I don't have to answer that. Just look at the court's claim construction. I won't tell you what a hierarchical system is. Just look at the court's claim construction. The way that you've described the difference between what the district court adopted and what you wanted doesn't naturally feel like it has much to do with the word hierarchy, whether you're doing a cluster with round robin or I guess in Oracle, what was told to the examiner was in Oracle, they go down or up one. The only communications are to the neighbors on the tree and you have to go up and down, but you can't kind of do other things. So I'm no expert, but here's the colloquial answer that I will give you that if each server can answer which other server to go look at directly, that means the servers are arranged in a flat configuration. I think as we put it in our brief, each server is kind of on an equal footing. Whereas if all you have to return is information usable by the client, that may well involve going to query a different hierarchy or reflecting it's not here, nor is it in my hierarchy. I mean, I think I'm being colloquial here. There is a fair amount of testimony about why we thought our product was not hierarchical and more to the point, we could not. Right, but if what we're trying to do is understand as a claim construction matter, what was disclaimed, the connection between the words used by the applicant or I guess the patentee in this case, since it's a re-exam and the claim term that was argued about, not quite a claim term, but one level down from claim term hierarchy might influence whether, how broad a disclaimer we wanna give. Yeah, I understand that point. And I think the best place I can send you is to look at the underlying disclaimer itself, which is just a couple of paragraphs. So at three, six, five, five, five. It appears twice for each of the two. Exactly, but the heading is verbatim the same. And other than the claim numbers, the two paragraphs that appear on the page I just gave, they also appear verbatim at two, four, four, four, one under the other patent. So that's exactly right. It explains why servers and hierarchically structured networks do not know what is contained in other servers throughout the network. And then that's contrasted with the flat system that I sort of probably poorly attempted to explain. But that's really the nub of the point is that it's the other side that got these claims through re-examination by making this representation. And the quote that the district court gave, he said, that too came from the re-exam. That's true, but it wasn't the thrust of what they said about hierarchy. And this really is the thrust of what they said. It should have been in the claim construction. Okay. If we have any questions on location or you said you wanted to cover damages. I would just say a word about damages. I won't tax the court's patience, but just to note that this is a $525 million jury verdict resting almost entirely on the scaling and hashing claims. There's no separate damages evidence or there's no separate damages number about the redirect claims. And- Can you assign numbers to those things?  No, of course. If you, you will- I don't mean dollar numbers. I mean, the scaling claims are redirect. I got to keep track of patents and their claims. I thought you told us somewhere in connection with another argument that the other side was trying to say you can uphold the damages award if you do one, if you say these are patent eligible and these aren't. And you rejected that. You said you can't divide up the damages argument with the damages amount with respect to the individual claims. I thought you'd made that argument. So that's actually the point that I'm making. So the damages award is one number. The other side put in no evidence of a number that corresponds to the redirect claims. So for example, if you upheld the redirect claims but struck down the others, there's no way that you could sustain the damages verdict. You would also knock out S3, which doesn't infringe the redirect claims. But even if you knocked out only the scaling claims, if you look at the evidence that went in- Just to speak, redirect or 970, 978 claim 10 and 640 claim 18. Yes, I'm sorry. I, and the hashing claims are claims one and two of 170. The scaling claims are 17 and 30 of 970. Okay, thank you. I'm sorry. But that's really the point is that the scaling claims drove such an enormous portion of this jury verdict that I know that a billion dollar number that the expert put in. Obviously the jury didn't take the billion dollar number and just write it on the verdict form. But I think there's no way that you could say that the presence of the scaling claims or the hashing claims in the case was not prejudicial if you and sustain the jury verdict on the ground that it didn't make any difference. So really just the quick point that I'll make about the jury award, that it rests on two key things, the bargaining split, and then the thing that the expert claimed would be split. And which was the supposedly billion dollar profit that really rested on a series of unsupported assumptions that the entire value of the price premium that S3 commanded was attributable to practicing the scaling claims. And the expert just didn't deal with the differences between the relevant products. And so I think under these circumstances, sustaining the verdict wasn't a piece of discretion. I thought your main argument was the 50, is any of this confidential? The dollar figures in the comparables are confidential, but only the dollar figures. But I thought it was the span and particularly the floor, not necessarily just the ceiling. That's absolutely right. And we do make the point that the idea that in 2007, in a hypothetical negotiation, at a time when the inventor says he would have considered a million dollar offer, that it would have come back with a floor of 50% bargaining split. We find that fanciful, especially in light of when you look at the comparable, such as a license to the entire portfolio of IBM, the largest patent of America. I mean, when you say what would have accepted a million dollars. I didn't say he would have accepted, he would have considered. Was what? He said he would have considered it. Would have considered it. Right, and he had bought it for $200,000. One of the problems with those kinds of things has to do with some of the assumptions that are built into the hypothetical negotiation. So I can easily imagine somebody in this position or some case like this saying, there's a really high chance that this patent is invalid for maybe for one or one reasons. So I'm not gonna get greedy. But once you've cleared that threshold, boy is this valuable. So you're right that the hypothetical negotiation does build in invalidity and infringement. But at the same time, I mean, I think that both the comparable evidence and also the evidence of like how much these products were worth and how much or how little it would have cost to design around. Those are all still fair game even in a scenario where you take invalidity to the off the table. So if you can design around much more cheaply. I assume all of that was tried. That's right. I mean, we are ultimately saying that the jury's verdict can't be sustained based on the evidence in part because of the incompleteness of the other side's presentation. So that when you look at which aspects of the damages analysis we put an evidence on and they didn't, that under these circumstances, a new trial would be required even if the liability verdict were to be affirmed. Okay. Thank you very much. Let me throw a little rebuttal. So Mr. Bishop, good morning. We went over and so I'm not gonna reset the clock, but we went over by 15 minutes. So if there are questions and you need it, we'll obviously give you a comparable. Thank you so much, Your Honor. May it please the court. Now, why don't I start by talking about 101 since that was a good portion of the discussion. And I think really the heart of the matter under the cases and what we're talking about here is how does this system work and are we, is the invention improving the way a computer operates or is it simply using a computer as a tool? And I'm gonna talk about it, questions permitting from two different perspectives. One is just describe how this is architecture and then two, describe how this is in no way, shape or form a card catalog. I think those are the two dimensions on which this turns. So there are, to put it briefly and then to get into the details, what code was replacing was systems like a card catalog. Of course, nobody thought that you could use a card catalog for distributed databases. That was not what was used. But it was replacing that type of architecture with four changes. The first part is that all the previous systems had either, as you noted, Judge Kovner, like centralized databases were a relational database for a thing where you wanted to get the data in the database. You had to know where to find that and go to it or alternatively a DNS model, which is similar to the Oracle model. DNS is you go up and down a tree. What does that mean? If you've ever looked in a joint appendix for a page number, you take a guess about where it is and maybe you're off. So you go earlier and then you go later and then you iterate and you find the right spot. That is very similar to a tree structure. There's no way to pinpoint exactly where you are, where you're going. Instead, you go up and down the tree. So the first of the four design changes that improved the way the computer operates, the first was this invention of intermediate location service. Nobody had used that in those prior art designs and importantly, these are not generic servers. We know that they're arranged in a non-hierarchical configuration. That means that either they return the information you're looking for or they can tell you how to get there. Those two things. And I'm gonna talk later about non-hierarchical because I think there were some misunderstandings in that. This builds on an architecture that is fundamentally different than a library. It's where you separate the concepts of a data entity from data and this is critical because this is why this is such an innovative product. A data entity is a logical grouping, say the movie Moana or a financial spreadsheet or any bucket that you, a book, any bucket you might put it in. The beauty of databases and distributed data collection is the underlying data that would populate that data entity, they're dispersed on remote servers and you only get the data entity, say the spreadsheet when you call it up. And here's the example that always resonates with me is a spreadsheet. Imagine you wanted a P&L for 2023 in your company. There's no place you go to get a P&L for 2023. You call up P&L for 2023, that's your data entity and that data entity then is populated by remote data that then go and fill the spreadsheet. What if I asked for a P&L for 2020 to 2023? It's using the same underlying data, you don't have to store it multiple times, it's populating the data entity. And this is critical to understanding how this works in life, not a library, it's not any of these conventional systems. I'm sorry, don't the claims here apply to anything that's a data entity, including a book? That is, if we're talking about 101, we're always asking the question, can I think of something that would be in this claim that is absolutely nothing but using computers off the shelf, computer electronics that do what had been in this case would be done in a library. So that creating the book by, on the slide, that isn't restricted to that, like creating your profit and loss statement. Well, actually it is, it is restricted to that in this way. I mean, not in the way that your honor said it, but in this way, as part of the claim construction, the claim language, the specification, all of it recognizes that we're talking about, and even AWS concedes that we're talking about data entities and data being distinct things. That is not a book. Yes, a book has it. I'm sorry, data entities and data being distinct things. The key distinction was there's, I don't know, data and data entities, and then most importantly, there is indexing information. That's what I, my shorthand for the identification, so it's the thing that you use for people, that people can search in order to ultimately get what they really want, which is not the information in the index, but the information that the index leads you to. Well, let me, that's not quite right, and this is, but it's exactly the right question, and that's why I'm emphasizing that the technological environment that this arises in is separating the data entity from the data. I mean, that is critical to understanding this invention. If I want the movie Moana, and I put in my request into AWS, it does not go to the movie Moana. The movie Moana is spread into 10, say I want Moana in Spanish. It's spread around 10 to 20 different location servers, the bits and bytes, the individual pieces of information that is only assembled when you call up a data entity. When I call up a P&L for 2023, there's no file folder like we're used to in the olden times, where you go to the file folder and pull the P&L for 2023. All that exists on the servers are bits and bytes of data in a disorganized, non-aggregated, non-logical bucket form. It's only when in a distributed database you call up the data entity that then it goes out and gets the data. Now, that's the first of four things that distinguish this from prior systems and make it a technological advance. If you don't appreciate that this arises in the context of distributed databases where data entities and data are separate things, just as AWS concedes, then that just drives you right to a library. Just to maybe help me understand a little bit, the distinction between data and data entity, is this something different from or the same as what I generally understand? Computer memory, if you want to store a file, the computer memory is not typically or in any way often is not storing all of the data that make up this file contiguously. It's putting different pieces everywhere, but it's maintaining internally an index so that when I ask for the file, the memory chip or the controller or something says, has a map. Is that doing something different from? Is that something different from that? Very different, your honor. And here's why. The easiest way to think of it is database. That's kind of a specialized term. In our case, it's either a database or a distributed data collection, but let's use database. Nobody thinks that they have a database on their hard drive unless they're doing something very special. A database, you know, in litigation, if you say to somebody, can you please print your database for me? The answer is that's nonsensical. The database is just data. Yeah. Some of this feels a little new to me. Like, does your claim, do you think your claim relies on, describes this concept of, you know, Moana being stored in many different places, there being essentially no book and that's part of your patent? Because I'm, where would I see that in your patent? Yes, it's absolutely in there. And it's placed, and there's two different things you can look at for that, three, I guess, if you include the specification. The claim itself, either, if you read it, very- Okay, can you identify which claim we're talking about? Sure, we're talking about the 170 claim. Okay. Claim one. Claim one. And when you, and I will admit, when I started with this case, I read over these words, and it was only upon studying them more carefully that I saw that it refers to, on the one hand, data entities, and then, at other places, it refers to data. The judge in this case interpreted, you know, pertaining to a data entity. She went through the Moana example in the claims instruction. She called it award-winning film, but it's the exact same example, Ms. Kovner, where she explains how the data are the bits and bytes, and in this patent, that is distinct from the data entity. So a data, the concept of a data entity that's described in claim one, you're saying, is this idea of Moana being, it's what, it's like the spreadsheet, it's the- It's the bucket. You would say, Your Honor, I'd like the movie Moana. The movie Moana in Spanish, let's say, is the bucket. That's a data entity. What populates that are the bits and bytes that are spread out in all different places. That's the data that you pull in. Okay, but now I'm confused, because all this says in claim one is a data repository configured to store a data entity wherein an identifier string identifies the data entity. So you said Moana is the data entity. Exactly. So a data repository configured to store Moana, wherein- The logical concept of Moana. That's the important thing. You're storing, the data entity is only a logical concept. The data that populates it, and that's what the rest of the claim is about, the data location or the individual data that populate it. So if I say spreadsheet or Moana, that's a logical thing. The movie Moana, the idea of it is a logical thing. And then the pointers in the system are pointing out to these 10 to 20 different places where you gather the data to assemble that movie Moana. So, and this relates to your question, Judge Torrento, what the location information is about is not locating a data entity. It's locating the underlying data to populate a data entity. And that can be 20, 50, 100 different places. It's organized when you need, and called up, Judge Kovner, when you need the information. Can I ask you a broader question, which I think may underlie a portion of what my colleagues have been asking about? The district, as I'm calling it, the district court opinion on 101 relied heavily, if not almost entirely, on the specification. And not on the plain language. And as you know, I think I'm correctly stating in our case law, it doesn't allow for that. It says you look at the claims. So is it fair that a lot of, am I correct in what, a lot of what you're saying here comes from the specification, but it is really reading the claims in the context and in accordance with the specification and relying so much on the specification? Am I misstating that? Are you not aware of that? I may be splitting hairs with you, Your Honor, but I would say, I've got these four design improvements, and we've gone through the first one. Each and every one of these is absolutely tethered to the claim. Unambiguous, it's right in there, and that we can walk through it. It is, of course, also in the specification, and it's also in the claim construction. It's in all three locations. But I'm not gonna talk to you today about a single thing that I can't point you to in the claim. All of this is in the claim. Now, in fairness, you're not going to see in a claim like this ever that somebody goes and explains in some sort of English way the difference between a data entity and data, but you can see as you read the claim that sometimes it's referring to data entity. That's a particular thing in computer science, and sometimes it's referring to data. And when we're in the context of a distributed data collection, aka a database, one skill in the art, of course, understanding this part of the claim construction that those are two distinct things. Pertaining to a data entity was construed as being two separate things. So that's the first thing. We have location servers arranged in a non-hierarchical configuration that builds on the architecture of data and data entities. Then we have, second, that the data entity has a unique identifier, and I'm not saying there's anything special about having a unique identifier, but this is how the system works. And you put, that identifier identifies the data entity, so the movie Moana in Spanish. That's a number or a string of characters that identifies the movie Moana in Spanish. Then the question is, where would the system find the underlying data out on these remote servers to populate that data entity? That's the location information that is present on the location servers. And how do you put the location information on the location servers? And this is a big part of why this is so unique. You use a hash function as a router. You're not using a hash function like personal web. You're doing something very different with that. I'd say it's more like diamond versus deer. The conventional use of a hash function, I think as counsel, my friend said, is, I'm defining it, this is what it is. So you can point us to the claim language you're now referring to. Are you in the middle of that claim one, which is based on a hash function? Yes, used to organize the data location information towards the NLSP. Let me explain what a hash function is conventionally. And you can look at personal web because it does the same thing. The definition of a hash function is, take a variable length string of any length, it doesn't matter, put it into the hash function, do the mathematical calculation, and out pops a fixed length string of characters. That's the math. That's what a hash function does. That's all that it did in personal web. That is not what code is doing. It is employing a hash function, but it's administratively limiting the output to only available location service. And there's no argument and no computer science sense that you'll find anywhere that that's what hash functions do. It is not what they do. They simply create this fixed string of characters. What the patent does is it says, based on those hash functions, you distribute the location information, which you can read more about it in the spec, the enabling part of the spec, but what it's talking about is administratively limiting the output of a hash function. And one skilled neuro would know that because it says, don't just run a hash function, it says based on a hash function. So, yes. Okay, no, finish your thought, but I think we need to move on to the next issue. Well, I wanna, and I'll quickly tell you the other two features just so you have them because I've only gone through two, but using hash function as a router, and then another design choice very quickly, Judge, is that you're distributing the hash function. That is an architectural choice. That means that you're putting the hash function out on the location servers. That is not any conventional use of anything, to be honest. And unlike the library, you are, when you go to a library card, it doesn't say, I'm sorry, War and Peace isn't here, but you can go find it over there. That's what this is doing with the distributed hash function. And finally, just to sort of wrap it up, Judge, you're using these intermediate location servers to map the data entity, the movie Moana, to the underlying data. All those things combined are architectural or design choices, and what do they do? They make a limitlessly scalable environment. The DNX and the centralized databases, their problem and why it would never work is that they've got an inherent upper bound on their scalability. So when you get to 100 million entries in an index changing each day, they could never possibly manage it. But with this architecture, there's no inherent upper bound to scalability. Let me move you to the second part of 101 where I started with Mr. J, which is assuming we might reject your argument on step one. I didn't quite understand what you were saying in your brief. You said you can take step two up if you find for me, but not if you're gonna find for the other side. To do that, you have to remand it. I think that's right, Your Honor. That's what I'm saying, because their position below was that fact issues on step two preclude summary judgment. Well, yes, they said that, but in the alternative, they said something quite different. So is that the reason you say we can't reach step two here? Because they admitted at the moment that- No, that's just part of it. The reason is they never moved for summary judgment. So to grant them summary judgment when we haven't had an opportunity to marshal our evidence and explain it. I mean, we were surprised when in the reply, we saw that they were actually not challenging the motion to- So you just started saying, well, we haven't had an opportunity to what? You're not- To brief step two. You're saying there's a factual dispute, which you didn't really say in red, and that you think that if we mandate on step two, it would reopen the record and an opportunity for you to submit new declarations on this question? Yes, in the spirit of what we're saying, what we were trying to say in the red brief is we know from time to time, the court will evaluate claims in a step two analysis, putting aside step one. You can still do that to find it eligible. But if we're talking about fact-based issues, they didn't move for summary judgment. The only motion was law of the case. They responded on law of the case, only about step one, and we weren't briefing step two. So yes, we believe that fact issues would come down in our favor, either precluding summary judgment for the defendant or actually requiring summary judgment in our favor. That hasn't been briefed on appeal. Below, it's never been taken up. So in your hypothetical, that would be the appropriate result as a remand for consideration of step two. Want to move to non-hierarchical? Yes, I'd be happy to. I think that one point was not surfaced appropriately in my friend's argument, and that is we were sort of conflating, oh, this is plain construction. Let's talk about plain construction. This was not plain construction. This was, and they clarified in reply, as we said in our brief, we don't know what order they're appealing. They said, oh, we're appealing the motion in limine order. That was when Amazon attempted to revisit the construction of non-hierarchical, and the ruling there is I'm not gonna revisit it. It's too late for that. I've already ruled about what the definition of non-hierarchical is. That's rebuke for an abuse of discretion. This isn't, we're taking this up fresh. That was in the context of summary judgment. In summary judgment, the judge allowed Amazon to brief. There was a prosecution disclaimer, and they briefed it about non-hierarchical, and they won that issue, that a non-hierarchical configuration, sorry, a hierarchical configuration was disclaimed. It has to be non-hierarchical, and the judge said there's a dispute about what non-hierarchical means, and so the judge defined the term non-hierarchical, and then he said I'm not gonna construe it further than that, further than what he had actually already ruled. But you have in your brief, you got it from somewhere in the record, I'm sure, a statement of what they were arguing, what they were claiming was the appropriate claim construction, and it really is a persuasive argument because it's virtually identical to what the district court came up with. In other words, what are they complaining about, or how can they complain about it now, and are you disagreeing with Mr. Jay that they were proposing another claim construction in the record? I agree with what you're saying, but there's a really absolutely critical path to get there. There's a reason we're not talking about what they actually proposed at claim construction, which was not what you're seeing now. They proposed a three-part definition at claim construction, which the judge went through in itemized detail in the summary judgment order. Do you have a plaintiff's appendix? I do. It's appendix 31 is the order, and it's quoting appendix 18696. Appendix 31? Yes, ma'am. At summary judgment, they proposed this very long definition. The court went through each of the pieces and reached its ruling and rejected that. Then at the motion of limine stage, they proposed a new construction that differed entirely from what they had proposed before. And where's their summary judgment stage proposal? Appendix 18696, your honor. 18696? Yes, sir. Which volume is that? I believe that's in volume one. And I can read it to you to focus the attention. At claim construction, they proposed that non-hierarchical means, hold on a minute. 18696. I'm sorry. So it's that three-part definition that you see there in the middle of the page that was proposed. And in the court's order at appendix 31, the court went through that and analyzed each of the pieces, rejected it, and found the claim construction, the definition of non-hierarchical. Then we fast forward. I'm sorry. So on 18696, the three parts, this is in the sentence that begins, here, Cove limited the scope? Yes, sir. That reads like a statement of your position, not of their position. No, this is their position. This is their document, but isn't that a sentence that says what your position is? Oh, I'm sorry. The context is they're saying there was prosecution history disclaimer, and during the prosecution history, Cove disclaimed hierarchical. And now this is where they say, this is what we want the word non-hierarchical to mean. So they're saying in the prosecution history, Cove limited the scope of asserted claims to these three things. That's what the judge analyzed. And there's very important reasons. But this goes on to say, but Cove's, I mean, and this is coming from Amazon, right? This is Amazon stocking. Yes, ma'am. And they say, but Cove's envisioned validity contentions before the re-exam did notify. There's more here. There is, but I'm saying, if you look at both the judge's order and you look at this, I'm just giving you a place to see what it is they were proposing as the definition of non-hierarchical. The reason, at least, that I asked you to focus on this is it seems to me that you're wanting us to focus on the motion eliminating not the summary judgment ruling and litigation is matters only if they didn't make, at the first stage, the argument that they are now making. And that's what I wanna understand. Well, yes. And can I give you one clarification? I'm not asking you to focus on one or the other. I know that. They said, they're only appealing to no rule. Right, but, right. Okay. If they made this very same submission to the district court at summary judgment and the district court said, there are a number of different statements here. I think it's enough just to say, A. And if they preserved, at that point, the argument that, no, you really needed to say, B, then that's a perfectly preserved argument for current purposes. It is, and that's not what they did. Okay. You can read this at your leisure and you will see that it's a fundamentally different argument that they're making at the, that's our point exactly, Your Honor, is that they want the benefit of de novo reviews. So we sort of slough over the fact that when it was de novo reviews, when there was claim construction, what they're proposing at the middle stage and on appeal is not what they were telling the court. At the summary judgment, you're making a point that at the summary judgment, they asked for a very restrictive definition of non-hierarchical, right? Like more restrictive than- I would just say different. Okay, it has the three parts. Yes. So the news on that, right? Yes. And so then they come back at the motion and when they say, I haven't lost on that, and then they're asking now for- For a new construction. So why aren't they allowed to do that? They know they've lost their moralist theory and now at the motion and when they stage, they're saying, okay, we accept that we're not gonna, you know, re-state our three-part test, but you should at least instruct on this version that's a little bit more restrictive than yours. Well, I would say that that's the case with nuanced communication and you don't get unlimited bites at the apple on claim construction. This was claim construction. Then when they came back and said, now we'd like to have another claim construction, it's within the judge's discretion to decide whether they're going to revisit claim construction. Do you think that the district court at the summary judgment stage resolved this dispute? Because Kent would say all the district court, the district court only went so far as it needed to go to resolve the summary judgment motion and it didn't decide this nuance between the two possible things you might have explained? No, I wouldn't say that. I would say that when you come in for claim construction, I mean, and your honor, as a district judge, I mean, when you come in for claim construction, you provide your construction to the court. The court rules on the two constructions that are in front of you. It rules for one side or the other. I'm not aware of any authority that says the district court must then, if somebody decides at the eve of trial that they don't like what they proposed before, that they get to propose a new one. As to what the district court ruled at summary judgment, it didn't pick between two versions of what you said to the CTO, right? It actually mentions both of them and it doesn't tell us which one? I would disagree with that, your honor. If we look at page 31, 38. Appendix 38. And your honor, you're honing in on the, right question. What Amazon's position is is that the judge didn't decide it. Now, I will just tell you as an important foreshadowing, the judge thinks that he decided it. The judge, when he ruled on their motion, said, I've already decided this. It was in black and white. I'm not revisiting it. So what does he say? The code on page 38, appendix 38. The code patents do not include a definition of non-hierarchical, but during, I'm over time. I just realized, I'm sorry. Oh, we're so over time. Okay. We're like startled. You've still got, by my count, three more minutes. You're still three minutes behind Mr. Jackson. Thank you, your honor. I'll tell you when you need to. Okay. So appendix 38, the patents don't include a definition, but during the re-examination process, code repeatedly described what non-hierarchical meant in the context of the patent. And it gave one of those places where it defined it. This is the definition that was provided to the jury and what the judge said he already ruled. He then goes on to say, Cove also provided multiple descriptions of servers in hierarchical configurations. So he's describing the opposite of hierarchical. And then he says here on 39, Cove acted as his own lexicographer in defining the claim term. And the court therefore adopts Cove's definition. That's the context in which he says no further claim construction is required beyond what he already ruled. And if we have any doubt, Judge Kovner, when they tried to do a new claim construction, a new interpretation of non-hierarchical at the eve of trial, the judge said on the record, I've already ruled on this. But wait a minute. The sentence following where you stopped, it says AWS does not dispute Cove's definition of non-hierarchical. And the state argues that the allegedly infringing products do not utilize the required configuration. Yes. So for purposes of claim construction and summary judgment, he was saying that the two are the same? He's saying this definition, any given server, the one that's on 38, he's saying that definition is not disputed. That's the definition. And that's what the court said and intended. I do want to just point out, and maybe this is more just a placeholder given the limits of time, that the judge also found in post-trial that there was no prejudice. This didn't affect the verdict. And there's an important reason why. When you look at Amazon's brief here, when they're talking about how this might have prejudiced them, they're actually misreading the claim. They say because a KFC, which is the location server, in some instances might have to get the information from a brick manager, the BM, that shows you that it doesn't meet this limitation. And it's talking about the second part of the NOS limitation that it proposed. The first part is the location server must be enabled to return the requested information. If you don't have it, can't return it, then you have to know, in their view, know which location server contains the information. Everything they describe in their brief and they described today was under the first part of the clause, not the second part. We all agree on the first part of the clause. There's no real estate between the parties on the first part of that definition. And everything they're describing is about the first part of that definition. And then on the second part of the definition, which is if you can't return it, you have to either know which server has it, or you have to, in their view, or in our view, provide information to tell you the location server to go to. There was no prejudice on that either because in the 170 Claim 1, it has, in other words, the same NOS limitation. NOS was proven. And their own documents say that if a KFC doesn't have, can't return the requested information and we cite this in the brief, it knows which other location server to send you to. So this wasn't something that was really an issue at trial. And of course, they have to show prejudice. And if you trace, that's why I said it's a bit of a placeholder because I realize it's a complex issue. But if you trace it through, this business about the KFC having to go to the BM was not under the clause that they're disputing. It was under the part of the clause that they agreed was the correct construction. Okay. You want to spend a few more minutes on damaging. Yes. I want to... Thank you, Your Honor. I want to clear up one misperception. My friend said that the price premium that's referring us into the Goldilocks argument drove all of this. That's just simply not true. The price premium, if we just look at that, as such, is just as to brick managers, just as to the scaling claim. It doesn't affect, which is the smallest part of this case. So it's just not true that it affected everything. And as we pointed out, this is not a doubted argument at all. There is no apportionment methodology argument here. On this record, it's undisputed what the profit tool was directly attributable. The only argument is Mr. Bergman should have, the damages expert, should have considered other factors more than he already did. There's actually one question on the bargaining split. Where does the 50% come from? Okay. And exactly. Here was the way the analysis went. And the case to read is Willis. Willis is dispositive. It's on all fours in this case. In fact, our situation is slightly better. We submitted this as a 28-J letter, Your Honor. Willis said, it's not apportionment. In apportionment, we're deciding the profit pool. You do, I think fairly read under the case law, have to come up with a quantified basis for the incremental benefit over non-infringing alternatives. Mr. Bergman, the damages expert, did that. And it's undisputed that he did that. And that's what the profit pool is. But then Willis says, once you're coming to how would hypothetical negotiators split up that profit, it's enough for the expert to say, I go through each factor and say, which ones had an upward effect and which ones had a downward effect. I say Mr. Bergman's was one step better because if you look at the expert report, which is part of what you're evaluating in Daubert, what he does is this. He goes through all of those factors. And then he says, probably the two most important factors here are that Amazon's own internal documents show that they're willing to give up virtually all of the direct profit to get all these indirect benefits. And they made all these extra billions of dollars in downstream benefits. And here's the important part. His actual conclusion was not then lamb 50%. His actual conclusion was, it is my opinion therefore, that Amazon will be willing to give up the vast majority of their profits. I get the top number as the theory for that. I guess I'm wondering the bottom number. Well, I'm being very specific here. So let me say it this way, because this is important. I think we're fine under Willis. Even if he said, and therefore I arrived at 50%, I commend you to Willis because that is exactly what happened in that case. Do you think he doesn't have to say anything to justify it? Or what did... Well, he does. He has to go through... I want to get to this qualification because it's so helpful. He has to say, this factors up, this factors down, this one increases, this one decreases. That's all for Willis. That's all she did. And at the end she said, and therefore it's this minimum and this maximum, which by the way, was a larger range than we have in our case. That passed muster under Willis. But he did one thing more that wasn't in Willis. He said, he didn't say, and therefore my conclusion is 50 to 100%. He said, my conclusion is, and this was directly tethered to the document, Amazon would be willing to give up the vast majority of its direct profits in exchange for all these indirect benefits. Then where does the 50% come from? It just comes from a matter of like sixth grade logic. How much, what percentage is the vast majority? I don't know, but it's at least 50%. It has to be. If it's the vast majority, you know it's at least 50%. So his analysis about the vast majority was directly related to a lengthy analysis he did under Georgia-Pacific that's on all fours with Willis. He concludes vast majority. And instead of doing something that I think would have been less analytically sound and saying, so I conclude vast majority is 64%, 75%. He takes the more conservative, reasonable view that whatever it is, we know vast majority is at least 50%. Okay, time's up. Thank you for your analysis. You've gone over, so I was allotting the bubbles. So you have five minutes to rebut. Thank you, your honor. Just a few points. A lot of the discussion in the 101 section was about things that are not claimed, right? And so there is no claim to data entities separate from data. This is the point that I made in the opening that there can be one data repository. Moana would be in the example is data or a data entity. It's not the location information that is stored on the location servers. One data repository can store all the data entities. There's nothing in here about dispersing it, separating it from the data that it contains. And the little odd that my friend referred to the district court's claim construction of the term data pertaining to the entity. And we've dealt with this in our reply brief, but I think the point that I want to make here is that that term doesn't appear in the claims in suit. It is in different claims that were no longer in the case. So I don't think that either the claim language or the claim construction can get you the concept that my friend said, we're making the difference in there. Just one quick point, I don't want to take up time, but his comment about hash function, that this wasn't what we think of as we know what the hash functions is something different. I think what he's saying is that what you put into the hash function is information that had not previously been put into a hash function, but the hash function itself is utterly conventional as specification says that. And in one-on-one terms, you know, that applying a hash function to a new environment or, you know, a new input that hadn't previously been put in, that doesn't make it subject matter eligible. Second point I just want to make about step two, just to reiterate quickly that they've never identified any fact dispute. They just said that there was an inventive concept. So for example, for the scaling claimants, they just said the transfer mechanism is what would satisfy step two. This is at that page I gave you before 661 to 62 from the 1236 opposition. I think it's fair to say that at a minimum, at no point in the case yet has the other side identified anything factual that would go to what we think of as a step two fact dispute, which is about what is routine and conventional. But the question is whether they get an invite at the end. I agree that that is the question. I agree, but I would just note that in most cases where this court has sent it back, there's at least a prospect of needing to do so. Now, I think as the court may remember, in the Optus case, for example, that was the posture the court faced. There was going to be a new trial anyway, and the court said to the district court, either figure this out before trial and figure out what needs to go to the trial with the rest of the stuff. Third point, this is about the non-hierarchical instruction. I think Judge Kovner is right that when you ask for, and Judge Toronto as well, when you ask for a jury instruction and it is refused on the record, that is generally enough to preserve the objection to the jury instruction, the refusal of the jury instruction. What the other side is saying is that because this is claim construction, we asked too late because claim construction was over. But I think it's important to understand the sequence. At summary judgment, the district court rejected their position that there had been no disclaimer. So that's where non-hierarchical entered the construction. But the court said it did not need to give any further construction of non-hierarchical. And why? One of the things that it said at page 41 of the appendix is that our request for the construction would be redundant, unnecessary, because Cove had already conceded that this is part of the disclaimer. So when we then capitalized on that, we wanted it put in the jury. So on page 39 of the appendix, the court says, and the court therefore adopts Cove's definition. What do those words mean? I'm honestly not sure, but I believe that if you read that together with the passage from page 41 that I was just referring to, this is at the bottom, inclusion of AWS's requested language would be redundant. Cove has conceded that the mandate that each server in the server network must be enabled to, and this is what we wanted, return the requested information or know which location server contains it is disclosed by the non-hierarchical configuration. So at page 41, the district court says that's what Cove had acknowledged or conceded. So we wanted a jury instruction that said exactly that. We said it again at greater length in the motion eliminate opposition. And if you look at the hearing on the motion eliminating pages 96 and 97 of the appendix, you will see that the judge said, one, I've already ruled on this. Two, I'm going to change my claim construction anyway. I'm going to add some more language, the language preferred by Cove that wound up in the final instruction. So this was not a matter of my claim construction is closed and I'm not changing it. The judge changed it. And we said, quote, I would prefer the further construction. And he said, not it's too late. He said, quote, I don't think the further construction is right, page 97. It was rejected on the merits. We've done everything we need to preserve it. And the other side hasn't explained why our construction is wrong. And I think Mr. Reckman said something to the effect under the heading of you haven't shown prejudice. Address that. Sure. And I alluded to this in the top side of the argument that we have a collection at page 52 of the blue brief. All the places in which the district, in which the other side's expert refused to answer questions about hierarchical structures and whether ours was one. Because he said, I'm not going to answer that because the court has given us the claim construction. The court has given us the claim construction and I'm not going to depart from it. And so I don't think it is correct to say that this part of the claim construction is. I think Mr. Reckman made his point by referring to KFC and BM. And I forget whether he referred to Skynet. Can you translate the question of prejudice into those specifics of the accused system? So I think that what he said today was that the KFCs could return the information and not something else by querying. I thought maybe he said that KFC, everybody agrees KFCs know this. But I don't think so. I think what he said was that they can return the information by getting it from a brick manager. But what the expert testified was that KFCs are non-hierarchical structure and brick managers also are a non-hierarchical structure. So in other words, I don't think that the jury could have concluded from that testimony that actually it's all one thing. Our position was that's a hierarchy. In other words, that the KFCs above the brick managers are a hierarchy and the other side's expert kept saying, forget everything that you know about hierarchy colloquially, stick to the court's claim construction. I think that's the problem. Okay. That's it. We're out of time. Thank you. Thank you. We thank both sides for taking this together. Thank you.